WILLIAM HAYS, appellant, v. ANDREW BORDERS, appellee.

*Appeal from Perry.*

When the same plea may be pleaded and the same judgment given on all the counts of a declaration, or wherever the causes of action are of the same nature, and may properly be the subject of counts in the same species of action, they may be joined; otherwise they cannot.

Under the third section of the Act concerning apprentices, any two justices of the peace in any county may bind out any poor child, &c.; but it is not necessary in terms to describe, in the indentures, the person so bound out, as a "poor child."

The original authority for indenturing and registering servants, with the mode of proceeding therein, is found in the law of the Territory of Indiana, entitled *"An Act concerning the introduction of negroes and mulattoes into this Territory,"* passed Sept. 17, 1807. This Act was continued by the territorial legislature of Illinois, by virtue of an Act passed Dec. 13, 1812, wherein it is enacted that "all laws passed by the legislature of Indiana Territory, which were in force on the first day of March, 1809, in that Territory, that are of a general nature and not local to Indiana Territory, and which are not repealed by the Governor and Judges of the Illinois Territory, are hereby declared to be in full force and effect in this Territory." Under this law, the offices of the clerks of the Court of Common Pleas were the depositaries of the books of indentures and registries of negroes, &c., and those clerks were the officiating ministers in the matters recorded in such books. The territorial acts creating the Supreme and County Courts divested the Court of Common Pleas of its vitality, and by virtue of the Act establishing the latter, the clerks of that Court were invested with the same authority in relation to the registry of indentures as were the clerks of the Common Pleas, when that Court existed. They, therefore, were the successors of those clerks, and their powers and duties in reference to such proceedings, were identical. The clerks of the County Commissioners' Courts subsequently became the successors of the clerks of the County Courts, and their certificates are, consequently, evidence of the authenticity and contents of the books of registry of indentures deposited in their office.

In regard to the sufficiency of a certificate of registry, the point settled in the case of *Phœbe* v. *Jay,* Bre. 207, is recognized in this case. The facts necessary to warrant the registry need not be recited in the registry.

A notice of the taking of depositions need not state the residence of the witnesses.

In an action for damages for enticing away the plaintiff's servants, the following instruction was given to the jury, to wit: "that the plaintiff, if entitled to recover at all, would be entitled to recover the value of the services lost, up to the time of the commencement of this suit, the reasonable expenses necessarily incurred in getting said servants back again, and damages for the loss of time, trouble and injury sustained until the commencement of this suit in consequence of the taking away of the negroes:" *Held,* to be correctly given.

A Court may not refuse to give any instruction to the jury, compatible with the law and applicable to the pleadings and the proof, when called for by either

Hays *v.* Borders.

party; but, in giving such instruction, is not imperatively bound to adopt, as its own, the language in which it may be asked. That language may be, and when, in the estimation of the Court, it is calculated to mislead the jury, should be so modified or changed as to prevent such a result, but not so as to alter the proposed exposition of the law.

An instruction to the jury, that if the jury believe from the evidence that the plaintiff lost the entire service of the registered woman, in consequence of the defendant's acts, the plaintiff is entitled to the value of the term of her service;" was *held* to be correctly given.

THIS was an action on the case brought by the appellee against the appellant, in the Perry Circuit Court, to recover damages for aiding, assisting, and enticing away his indentured servants. The trial came on at the April term 1844, before the Hon. James Shields and a jury, when a verdict was rendered in favor of the plaintiff below for $300. The declaration contained seven counts, the substance of which appears in the Opinion of the Court.

*L. Trumbull* and *W. H. Underwood*, for the appellant:

It is objected to the declaration, that it contains counts, some of which are for a penalty founded on the statute, and others for such damages as could have been recovered at common law, which is a misjoinder. 1 Chitty's Pl. 229, 448, 231; 1 Tidd's Practice, 11.

The indentures of apprenticeship do not show that the persons bound were *poor children*, or such as two justices of the peace had a right to bind out, and are consequently void. R. L. 68; *Demar* v. *Simonson*, 4 Blackf. 132; *Reidell* v. *Morse*, 19 Pick. 358; and their departure from Borders' service was not unlawful. *Boston Glass Manufactory* v. *Binney*. 4 Pick. 425.

The certified copy of what purported to be a registry of one of said servants was improperly admitted in evidence, said registry, not being in accordance with the territorial laws, nor properly certified. Territorial Laws, 468, 469. The Court of Common Pleas was abolished in 1814, and before the time of said registry; hence a copy of a record of the clerk of that Court in 1817 is a nullity. Territorial Laws, 337, 339, 345, 348.

The declaration no where claims damages for an entire loss of the services of the registered woman; consequently the instruction, that if the jury believed from the evidence that plaintiff lost her entire services in consequence of defendant's acts, the plaintiff would be entitled to recover the value of the term of her service, was erroneous. 1 Chitty's Pl. 444; 1 Tidd's Prac. 445.

Had plaintiff declared for an entire loss of the term of the registered servant, a portion of which was unexpired at the commencement of the suit, still the instruction would have been erroneous. *Hambleton* v. *Veere,* 3 Saund. 170, case 30; 1 Chitty's Pl. 444.

The value of the services lost, and reasonable expenses incurred in the recaption of said servants, was the proper measure of damages in this case, and consequently the instruction, that plaintiff was entitled to recover, in addition, damages for the loss of time, trouble and injury sustained until the commencement of the suit by reason of the taking away said servants, was calculated to mislead the jury and erroneous. 1 Chitty's Pl. 444; 1 Tidd's Prac. 445.

The Court was bound to give the instructions asked by defendant, they being in conformity with law. *The State of Illinois* v. *Wilson,* 2 Scam. 226.

The testimony in the case did not show that defendant had any knowledge that the persons claimed by plaintiff below, were his servants or apprentices, nor in any manner warrant the finding of the jury, and therefore a new trial should have been granted. *Stuart* v. *Simpson,* 1 Wend. 376; *Boston Glass Manufactory* v. *Binney,* 4 Pick. 425.

*G. P. Koerner,* for the appellee, as to misjoinder of the causes of action, cited Minot's Digest, 577; and as to the sufficiency of the indentures, Laws of 1827.

No defect in registry can be taken advantage of here. 1 U. S. Digest 198, § 114; Territorial laws, 425, §§ 5, 6.

The County Court was the successor of the Court of Common Pleas.

The Court did not err in substituting, for the instruction

asked, the modified instruction.   As to the other instructions, the Court decided correctly, particularly as to the value of the entire term of service.   If the servant was but one or two months over four years of age, the term had expired when suit was commenced; at all events, the term had expired at the time of trial.

If two instructions are given, one of which is improper, they will be considered together, and judgment, for such reason, will not be reversed.

The presumption is, that a verdict is upon the good counts, when some are good and others bad.   Minot's Digest, 192, Div. II, § 3.

*D. J. Baker*, on the same side:

It is perfectly immaterial whether these indentures were void or not, in this case.   The only question was, were the servants enticed away *de facto* the servants of the plaintiff?

The certificate of the clerk of the County Commissioners' Court was sufficient evidence of the transfer of the records of the Court of Common Pleas into that court.

The doctrine in regard to apprentices does not apply; consequently the instructions given were right.   *Singleton's Will*, 8 Dana, 319; *Lively* v. *Ball*, 2 B. Monroe's R. 53; 5 Ala. 242.

The Opinion of the Court was delivered by

THOMAS, J.   This was an action on the *case* for aiding, assisting, and enticing away servants and apprentices, brought by the appellee against the appellant.

The declaration contains seven counts.   The first count is for aiding, &c. four of plaintiff's servants to absent themselves from his service, whereby, as he says, he lost their services from 15th Sept. to 1st Dec. 1842, and was put to great trouble and cost, and expended a large sum of money, viz: $200, in getting the servants back into his possession.

The second count charges the enticing away of Sukey, the plaintiff's registered servant, whereby he alleges that his said servant was wholly lost to him, and that he was put to

great trouble and cost, and compelled to expend a large sum of money, to wit: $200, in recovering possession of her.

The third count is for enticing away one servant of the plaintiff, and is, in other respects, similar to the first.

The fourth count is for enticing away three apprentices of the plaintiff, and the fifth, sixth and seventh counts are each for enticing away one of his apprentices.

To these several counts the defendant demurred, and they being held sufficient by the Court, withdrew his demurrer, and pleaded not guilty. The jury impannelled for the trial of the issue on this plea found the defendant guilty, and assessed the plaintiff's damages at $300.

A motion was made for a new trial, which was overruled, and judgment rendered on the verdict.

During the progress of the trial, a bill of exceptions was filed, preserving all the testimony in the cause, and the exceptions taken to the various opinions of the Court. The case is brought into this Court by appeal, and the appellant assigns for error, the insufficiency of the declaration, the admission of illegal and improper testimony, the giving and refusing certain instructions to the jury, and the refusal to grant a new trial.

It is objected to the declaration that it is defective by reason of a misjoinder of counts and causes of action, in this, that it contains counts for a penalty founded on statute, and others for such damages as could have been recovered at common law. The result of authorities on the subject of the joinder of different forms of action is said to be, that "when the *same plea* may be pleaded and the *same judgment* given on all the counts of the declaration;" or, "wherever the causes of action are of the same nature, and may properly be the subject of counts in the same species of action, they may be joined; otherwise they cannot." 1 Chitty's Pl. 229; 1 Tidd's Prac. 11. Tested by these rules, the declaration is not obnoxious to the objection urged against it.

It is not suggested by the counsel, nor perceived by the Court, that any one of the counts is insufficient in itself; the

judgment is, therefore, not assailable on the ground that entire damages were rendered upon the declaration, &c.

The items of evidence offered to the jury by the appellee, and objected to by the appellant, and the legal admissibility of which in evidence is now questioned by the assignment of errors, consist of

1. The several indentures of Jarrott, Anderson, and Harrison, the apprentices named in the declaration, respectively entered into before two justices of the peace of Randolph county, by and with the consent of the probate justice of the peace of said county.

2. A paper, in the words and figures following, to wit:
"Registry of Negroes, Mulattoes, &c."

| Date. | Person's name entered. | Age. | By whom entered. | Color. | Sex. | For what length of time entered. | From where last brought. | Remarks. |
|---|---|---|---|---|---|---|---|---|
| 1817, Jan'y. 10th. | Sukey. | About five years. | And'w. Borders. | Black. | Female. | Until 32 years of age. | Georgia. | |

"State of Illinois,
Randolph county.  I, Ferdinand Maxwell, clerk of the County Commissioners' Court in and for said county, do hereby certify that the foregoing is a true copy from the records of the registry of negroes and mulattoes, as the same exists of record among the records of the Court of Common Pleas, in and for the county of Randolph, in the late Illinois Territory, and now in my office, into which they have been transferred.

In testimony whereof, I have hereunto set my hand and affixed the seal of said Court, this 8th day of April,
[Seal.] A. D. 1844.

F. Maxwell, Cl'k."

And 3d. The depositions of Peter Frans and Sally Newman.

These questions as to the admissibility of evidence, I will dispose of in the order in which they are made.

Then, first, as to the indentures of apprenticeship. They are said to be defective in not showing, in express words,

that the persons bound were poor children, or such as two justices had a right to bind out, and consequently void.

In this view of the subject, I do not concur. The authority of the justices for binding out the apprentices named in these indentures is found in the third section of the *"Act respecting Apprentices,"* (R. L. 69; Gale's Stat. 53;) and which makes it lawful for any two justices of the peace in any county of this State to bind out any poor child, who is, or shall be chargeable to the county, or shall beg for alms, or shall be unable, by reason of infancy or inability, to take care of and support himself, or herself, &c., to be apprentices, &c. The indentures in question do not describe the persons thereby bound out as poor children, it is true; nor, as I apprehend, were they required by this act to do so, in terms.

They, however, do describe the child bound out in each case, as a negro child, named, &c.; the natural child of Sukey, a registered servant, &c., and "unable, by reason of infancy and inability, to support himself." Could the indenture be required to furnish any other intrinsic evidence of the poverty of the children than is here done by describing them as the illegitimate offspring of a parent, herself in bondage, and, of course, destitute of the means of supporting them? ' I think not. The recital, therefore, in this respect, substantially, and in all others, literally conforms to the requisitions of the statute.

This doctrine in no wise conflicts with that expounded in the cases relied upon by the appellant's counsel. The first of those cases, *Demar* v. *Simonson*, 4 Blackf. 132, simply settles that indentures which show upon their face that they are executed in cases not warranted by law are void; and the other, *Reidell* v. *Morse*, 19 Pick. 358, that indentures executed under a statute should recite the cause of the binding out, and that such recital is not conclusive, but in an action by the parent for the services of the child, might be contradicted by evidence *aliunde*.

It has been held in England, that in cases like this, the defendant cannot avail himself of any objection to the indenture of apprenticeship, 2 H. Black. 511—7 Term Rep. 310, 311, 314—1 Anstr. 256; and that an apprenticeship *de*

*facto* would always suffice against a wrong doer, though there was no legal apprenticeship. 6 Mod. 69; 1 Salk. 68. But whether that doctrine would be recognized by this Court or not, is needless now to determine. It is sufficient for the purposes of this question, that the indentures under consideration are, by their own showing, legal.

The next question to be examined grows out of the objection of the appellant to the introduction, in evidence, of the paper purporting to be a certified copy from the registry of negroes and mulattoes in Randolph county. It is insisted that that paper was inadmissible in evidence for the following reasons, to wit:

*First.* Because no Court of Common Pleas existed on the tenth day of January, 1817, the date of such supposed registry.

*Secondly.* Because, if said certificate of the clerk could be so construed as to prove the act of registering to have been done before the clerk of the County Court of said county, at the date thereof, still that act of registry was void, as it should, by law, have been made with the clerk of the Supreme Court of the Territory, within and for that county, and not otherwise; and

*Thirdly.* Because such registry was void, by reason of its not stating the precise age of the servant registered, nor showing that such registry was made in the time prescribed by law, nor by whom the person registered was brought into the Territory.

An examination of these objections necessarily involves an inquiry into the mode of acquiring property in the services of negroes and mulattoes, by registering or indenturing them, under the territorial laws. In making such inquiry, I will notice the objections, not in the order they are made, but in reference to their relative importance. In this particular, then, the second objection requires the first and most thorough investigation. The disposition of the others, of course, might control or affect the result of this suit, but upon the determination of this, depend the rights of very many persons to much and valuable property.

The authority for indenturing and registering servants, with the mode of proceeding therein, is found in the law of the Territory of Indiana, entitled *"An Act concerning the introduction of negroes and mulattoes into this Territory,"* passed Sept. 17, 1807. Territorial Laws of Indiana.

The first and second sections of this law authorize the introduction of negroes and mulattoes over fifteen years of age into the Territory, in certain cases, and the indenturing of such negroes and mulattoes within thirty days thereafter, in the presence of the clerk of the Court of Common Pleas, who is required to make a record thereof in a book to be kept by him for that purpose. Ibid. 467, 468.

The fifth section provides for holding negroes and mulattoes under fifteen years of age to serve their masters or possessors, males until thirty five, and females until thirty two years of age. Ibid. 468.

The sixth section prescribes the mode of registering servants, and is as follows, to wit: "any person removing any negro or mulatto into this Territory, under the authority of the preceding sections, it shall be incumbent on such persons within thirty days thereafter to register the name and age of such negro or mulatto with the clerk of the Court of Common Pleas for the proper county. Ibid 469.

A separate government for Illinois Territory was established by an Act of Congress passed Feb. 3, 1809; and afterwards by an Act passed by the Territorial legislature of Illinois, Dec. 13, 1812, it was enacted that "all laws passed by the legislature of Indiana Territory, which were in force on the first day of March, 1809, in that Territory, that are of a general nature and not local to Indiana Territory, and which are not repealed by the Governor and Judges of the Illinois Territory, are hereby declared to be in full force and effect in this Territory. Ib. 33, 24. The law of 1807 above referred to, not having been repealed in manner aforesaid, was thus continued in force as a law of the Illinois Territory, and no other provision on the subject, was ever afterwards specifically made by legislative enactment. So long, therefore, as the Courts of Common Pleas remained with powers and ju-

risdiction unimpaired by legislative innovation, no doubt could or did exist, as to the proper officer before whom this ceremony was to be performed. The offices of the clerks of those courts were the depositaries of the books of indentures and registries of negroes, &c., and those clerks were the officiating ministers in the matters recorded in such books. But, afterwards, when those courts were abolished, their jurisdiction and powers parcelled out among other tribunals, and the duties and functions of their clerks divided among, and required to be performed by the clerks of other courts, doubts were engendered, and in the minds of some persons, would seem still to exist, as to the functionaries inheriting this prerogative of their clerks.

A careful examination of the several provisions of law distributing the jurisdiction and powers of the Courts of Common Pleas between the Supreme Court of the Territory and the County Courts established in the several counties of the Territory, and devolving the powers and duties of the clerks of the former tribunals, upon those of the latter, by distribution, together with a general reference to the nature of the jurisdiction of those several courts succeeding to the powers and jurisdiction of the Courts of Common Pleas, and to the purposes of their creation, are necessary to the solution of such doubts. I therefore proceed to such examination, in the confident belief, that I can demonstrate that, by the operation of the several laws to be considered, negroes and mulattoes might properly have been indentured and registered before clerks of the Common Pleas and County Courts, whether they could have been before any other officers or not.

The act entitled "*An Act establishing a Supreme Court for Illinois Territory*," approved Dec. 13, 1814, was the first to take from the Courts of Common Pleas any of their jurisdiction and powers; but those courts were not entirely abolished by it. It impaired their powers and curtailed the duties of their functionaries, but did not annihilate them, and among the residuum of duties remaining to be performed by their clerks was, as I conceive, that under consideration. Ibid 337.

But it is insisted by those who put a different construction

upon this law, that it operated to take from the clerks of the Court of Common Pleas the custody of the books of the indentures and registries of negroes, &c. and giving it to the clerks of the Supreme Court, thereby to transfer from the former to the latter officers, the powers and privileges incident to the keeping of those books. This exclusive authority claimed for the clerks of the Supreme Court, is derived under the thirteenth and fourteenth sections of the law enacting as follows, to wit:

"Sec. 13. A clerk shall be appointed by the Governor of the Territory, in each county, whose duty it shall be to issue process, in all cases arising in his county; to keep and preserve the records of all the proceedings of the Court therein; and to do and perform in his county all the duties now enjoined on the clerks of the General Court, and the several clerks of the Courts of Common Pleas, *except those which relate exclusively to county business, of which the court hereby established has no original jurisdiction.*"

"Sec. 14. Whensoever the Governor shall appoint a clerk as aforesaid, it shall be his duty if any Court of Common Pleas shall have been established in the county to demand of the clerk of said Court of Common Pleas therein all the books and papers in his possession, *except those which relate to the county business, of which the court hereby established has no jurisdiction,* and such clerk of the Court of Common Pleas shall deliver the same under the penalty of one thousand dollars," &c.  Ibid 339.

This language of these provisions of law, it is conceded, does not leave the question under consideration free from doubts. The difficulty is found in determining what duties are excepted from the transfer of duties, from the clerks of the Courts of Common Pleas to the clerks of the Supreme Courts. If such only were intended to be designated by the exception, as solely affected the interests of counties, as corporations, then the duty of clerks of the Common Pleas connected with the indenturing and registering of servants was not embraced therein, and did devolve on the clerks of the Supreme Court. But I think that such is not the proper construction

of the language used.   My impression is, that the exception
included not only duties relating to mere county business, but
also such as related to any and all other business, of which
the Supreme Court had no original jurisdiction.

In this view of the subject, the extent of the transfer of
clerical duties in this case, would be measured by the juris-
diction of the Supreme Court.   That jurisdiction is defined,
the nature and character of those courts are exhibited, and
the powers and privileges of their judges are enumerated in
the sixth section of the act establishing Supreme Courts,
(Territorial laws, 337,) and the third section of the law sup-
plemental thereto, passed Dec. 22, 1814.   By reference to
those laws it will be seen that the entire powers and juris-
diction of the general courts were merged in this tribunal,
and that it also absorbed "all the common law jurisdiction,
whether of a civil or criminal nature, with which the Courts
of Common Pleas had been vested, not inconsistent with the
principles of the law creating it; while all the powers and
duties, which were, previous to the passage of the law estab-
lishing the Supreme Court, vested in and enjoined on the
Judges of the courts of Common Pleas, and the Judges of the
General Court so far as the same were connected with the
jurisdiction or duties of the Supreme Court, were vested in
and required to be exercised by its Judges.   Looking, then,
for the limits of the judicial and clerical powers and duties
conferred on the functionaries of the Supreme Court, into
the laws establishing the courts from which those powers and
duties were derived, and it appears that the Supreme Court
was clothed with original and appellate jurisdiction for the
trial of civil and criminal causes only, and therefore intended
for purely judicial purposes.   Ibid. 303, 305, 312.

Then why claim for the clerks of the Supreme Court any
other duties than those incident to, or connected with its
jurisdiction?   Why not fix the same limits to the transfer of
clerical, that is by law assigned to that of judicial functions?
The Courts of Common Pleas being still left in existence,
why strip their clerks of powers and privileges peculiarly ap-
propriate to their office, and confer them on the clerks of

other tribunals, brought into existence for wholly different purposes, when the legislature expressly refuses to clothe their judges with any powers incompatible with the jurisdiction legitimately exercised by them? A single instance of the operation of such a construction will suffice to prove it incorrect. By *"An Act concerning Executors and Administrators,"* passed Sept. 17, 1807, certain probate powers were conferred upon clerks of the Common Pleas Courts in vacation, subject to revision by those courts, (to which it gave plenary probate powers,) in term time. This power of the clerks was incident to the jurisdiction of the courts, and such jurisdiction not being connected with, or relating to the trial of causes civil or criminal, and therefore not passing to the Supreme Court, this duty, of course, did not pass to the clerks of that Court. If it were otherwise, then by separating the jurisdiction from its incident, it would follow, that the courts of Common Pleas would possess the power of revising clerical duties, which their clerks could not perform; while, on the other hand, clerks of the Supreme Court might perform certain duties, which that Court could not revise, those duties being in either case, to some extent, inoperative without judicial sanction. Then this duty, although not relating to county business, did not devolve upon the clerks of the Supreme Court for the reason that it did relate to business, of which that Court had no jurisdiction.

But there are other laws *in pari materia*, necessary to be considered in the investigation of this subject. The act of immolation of the Common Pleas was not consummated by the law creating the Supreme Court. Those tribunals, shorn of all their more general powers and jurisdiction as courts, still survived for purposes incompatible with the nature and duties of the Supreme Court, until by the *"Act concerning County Courts,"* passed Dec. 19, 1814, they were deprived of their last vestige of vitality. By that law Courts of Common Pleas were made to pass quietly out of existence, and a new creature, styled County Courts, to supply their place, while, by a sort of *legislative metempsychosis*, the soul of the former was caused to enter into, and animate the body of the latter.

By a comparison of the provisions of the law establishing County Courts, with the enactments in relation to the Courts of Common Pleas, it will be seen, that the organization, powers, duties and jurisdiction of these two courts were identical, and therefore, that the legislature, instead of creating a new tribunal, may be said to have only intended, in the exercise of their undoubted prerogative, to change the name of an old one. But be this as it may, the propriety of indenturing and registering negroes and mulattoes before clerks of the County Courts, as originally required to be done before clerks of the Courts of Common Pleas is, under this law, undoubted. If the powers and duties of the clerks of the Courts of Common Pleas, in reference to such proceedings, had not been transferred from them to the clerks of the Supreme Court, by the law establishing the latter court, then this law continued those powers and duties with the clerks of the County Courts; while, on the other hand, if those powers and duties had been thus taken away from the clerks of the Common Pleas, they were hereby restored to their successors, the clerks of the County Courts.

A careful examination of several of the provisions of the law concerning County Courts, will prove the foreging positions to be correct. The first section, after providing for the establishment of County Courts, enacts that "the said courts shall have, possess and exercise all and every of the powers, privileges and jurisdiction (as near as may be,) and perform the same duties, that the Courts of Common Pleas of the respective counties might lawfully have performed on the first day of November last, except so far as relates to the trial of causes civil and criminal, over which the County Courts shall have no jurisdiction, for the trial thereof." Thus, then, it is apparent, that if the Act of Dec. 13, 1814, had stripped the Courts of Common Pleas of any other attributes than those pertaining exclusively to judicial proceedings, this law expressly restores to the legal successors of those Courts, all such attributes, thereby leaving to the Supreme Court no jurisdiction derived from that source, except in relation to the trial of causes civil and criminal. Ibid. 345, 346.

But again, by the fourth section it is enacted, that "the clerk of said Court shall be appointed in the same manner, in all respects as the clerks of the Courts of Common Pleas were appointed, and they shall have the same power in court, and in the vacation thereof, and perform the same duties, that the clerks of the Courts of Common Pleas could or might have done, and the clerks shall have the same fees that are allowed by law. Ibid., 347, 348. Is not this language sufficiently explicit for the purpose of continuing to clerks of County Courts, all of the powers and duties of clerks of Common Pleas touching the matter of indenturing or registering negroes, &c., if not previously divested by law, or if divested, of restoring them? I think so, most certainly. The clerk of the Common Pleas could or might have exercised this power and performed this duty either in court time or vacation, and they consequently come within the class of duties and powers, conferred by this section on clerks of County Courts. But if this delegation of powers is to be measured, with reference to the rights of clerks of the Common Pleas to the exercise of powers and performance of duties, not at any and all times during their official existence, but at some particular period of time, then this section is to be construed in connecnection with the first section, and it follows, that as this power and duty do not relate to the "trial by the Common Pleas of causes civil and criminal," the clerk of the Common Pleas could have exercised and performed them on the first day of November, 1814, and therefore clerks of the County Courts could properly do so, under this law. Then, in any aspect in which the provisions of this law can be viewed, authority for the performance by clerks of the County Courts, of the duty claimed for them, may be legitimately deduced under this law. Ibid, 347, 348.

But, in addition to this law, there was another Act supplemental to it, and intended to relieve it from its supposed obscurity, passed Dec. 24, 1814, to which reference here is barely necessary, as it did not accomplish its intended office of explanation. It simply requires, so far as it relates to clerks of County Courts, that those clerks shall perform all

the duties, before its passage, vested in, or required of the clerks of the Court of Common Pleas, so far as the same duties related to the powers and jurisdiction of the County Courts, and "all other duties that had not been transferred either expressly, or by necessary implication to the clerks of the Supreme Court," but no others. I think I have shown, that the duty under consideration had not "been transferred either expressly, or by necessary implication to the clerks of the Supreme Court," and, therefore, that it is recognized by this law, as belonging to clerks of the County Courts, as, had this law not been enacted, it would have been.

However, satisfactory as the foregoing conclusions would seem to be, they cannot be said to be removed entirely beyond the pale of doubt, so far as they go to show the powers and duties claimed for clerks of the County Courts to belong to them exclusively. The law last referred to, as is shown by its preamble, was the offspring of doubts on this subject, even then, cotemporaneously with the creation of the several courts and functionaries, whose powers and duties are under consideration, existing. The necessary consequence of the existence of these doubts was, that in some cases the clerks of the Common Pleas transferred their books of indentures and registries of servants to the clerks of the Supreme Court in their respective counties, and in others to the clerks of the County Courts, according to the construction put upon the several laws that have been examined. Therefore, while we hold that negroes and mulattoes might have been legally indentured or registered before clerks of the County Courts, after the establishment of those courts, we are not prepared to deny the right of clerks of the Supreme Court to the custody of the books containing such indentures and registries, placed in their hands by the clerks of the Common Pleas of their respective counties, particularly if such books contained, also, as in some cases they probably did, the records of the judicial proceedings of the Common Pleas in trials of civil and criminal causes, and were, therefore, imperatively required to be surrendered to the clerks of the Supreme Court. In this view of the subject, the clerks of the County

Commissioners' Court, having succeeded to the general duties of the clerks of the County Courts, are now the proper keepers of the books of the indenturing and registering of servants, either before the clerks of the Common Pleas, or County Courts, where, on the organization of our State government, those books were found in the County Court clerks' office of their respective counties; and consequently the certificates of those clerks are evidence of the authenticity and contents of such books.

The inquiry arises in disposing of the next objection to be considered, whether there is in the record any sufficient evidence that the book, from which the registry recited in the certificate in this case is copied, ever was in the office of the clerk of the County Court of Randolph county? If so, the certificate of that clerk was admissible to prove its contents. In the examination of this question reference should be had as well to the history of the registry of negroes and mulattoes, as to the phraseology of the certificate. Those annals are found in the legislation already so extensively examined, and show, that although the Courts of Common Pleas had ceased to exist in 1817, yet their records had not, but were still extant, and in other hands were in actual use for the purposes of their original destination.

Among other books and records of the Common Pleas, transferred on the abolition of those courts to the County Courts, were the books kept by the clerks of the former Courts for the registry of negroes, &c. for the space of seven years. These books, originally denominated records of the courts of Common Pleas as pertaining to the duties of their clerks, did not afterwards lose that distinctive appellation, when used to record registries by other clerks. Such, undoubtedly, was the fact in this case. The clerk of the Common Pleas of Randolph county kept the registry of negroes, &c., until his office was abolished; the clerk of the County Court succeeded to its custody, and, as authorized by law, entered the registry of negroes, &c. in it, until he, in his turn, gave way to the clerk of the County Commissioners' Court, and transferred to his hands this among the other records of his office.

The County Commissioners' clerk, thus becoming the successor of the clerk, not of the Common Pleas, but of the County Court, acquired the right by derivation from the latter officer, to prove whatever he could have done touching this record, but nothing more. He might, therefore, properly authenticate it as a record of the County Court *eo nomine,* or of the Common Pleas as having been transferred from that court to the County Court, and from it into his office. Does not the certificate under consideration thus establish the book, from which the registry set out in it is copied, as that record? Purporting, as it does, to be a record of the Common Pleas, and having been proved by the certificate, to have been transferred to the office of the clerk of the County Commissioners' Court, it does not require the aid of very violent presumption, to trace it back to its origin in the office of the clerk of the Common Pleas, and thus to identify it as the book in which the registries of negroes, &c. were entered by the clerk, as well of the Common Pleas as of the County Court. The certificate is, therefore, sufficient in my estimation to prove the registry of the servant Sukey, as having been entered by the clerk of the County Court. Either the book copied from, or the particular entry copied, may be considered as existing among the records of the Common Pleas, the former as being a record of, or pertaining to that Court; the latter as being entered among the records of the registry of negroes, &c. made by the clerk of the Common Pleas, although not a record of that Court itself.

The only objection to the certificate remaining to be considered, has already been disposed of by this Court in the case of *Phœbe* v. *Jay,* Bre. 207, so far as it goes to attack the registry for not showing by whom the person registered was brought into the Territory, nor that she was registered within thirty days after her arrival. By the authority of that case, and subsequent adjudications affirming it, it is settled, that the facts necessary to warrant the registry need not be recited in the registry.

The remaining branch of that objection is likewise unavailing to defeat the registry. The law is sufficiently complied

with by the registry, in describing Sukey (the servant registered,) as being, at the date of the registry, about five years of age; this can only be construed as indicating that as her exact age, as it was unquestionably intended that it should do. This, then, constitutes no valid objection to the registry; or if it does affect it at all, does not render it wholly void, and therefore, cannot properly be here inquired into.

I come now to consider the question of the legal admissibility in evidence of the depositions of Peter Frans and Sally Newman, read to the jury by the appellee, and objected to by the appellant. Several objections were made to these depositions in the Court below, and are again suggested here, but one only seems to have been relied upon, and the other, therefore, need not be noticed. That objection is, that the notice of the taking of these depositions was insufficient, "in this, that it did not state the name of the officer before whom such deposition would be taken, nor the residence of the said witnesses." The alleged defect in the notice does not exist. It does designate "the clerk of the Circuit Court of Knox county," as the officer before whom the depositions are to be taken, and specifies the time and place of taking them. It does not, however, and need not, state the residence of the witnesses; that office was properly performed by the affidavit filed by the appellee. R. L. 226; Gale's Stat. 244, § 2.

The next question arising upon the records, and made by the assignment of errors, grows out of the refusal of the Court to give certain instructions to the jury, as asked for by the appellant's attorney, and the giving of certain other instructions in their stead; and, the giving of a certain instruction asked for by the appellee's attorney. *First,* as to the instructions requested on the part of the appellant. They were as follows, to wit:

1. "That if the jury believe from the evidence, that the defendant is guilty, as charged in said declaration, then the plaintiff can only recover in this action the value of the services lost, up to the time of the commencement of this suit, and the reasonable expenses necessarily incurred in getting said servants back again."

2. "That the jury must believe, from the evidence, that the said Sukey and her children were bound to render service to said Borders as his apprentices or servants, before they can find a verdict for the plaintiff."

These instructions the Court refused to give, in the terms in which they were asked, and instructed the jury, in lieu of the first of said instructions, "that the plaintiff, if entitled to recover at all, would be entitled to recover the value of the services lost, up to the time of the commencement of this suit, the reasonable expenses necessarily incurred in getting said servants back again, and damages for the loss of time, trouble and injury sustained, until the commencement of this suit, in consequence of the taking away of the negroes;" and, instead of the other, "that the jury must believe, from the evidence, that the said negroes were servants or apprentices of the said plaintiff, before they could find a verdict in his favor."

In 4 Moore, 12, it is said, "that the measure of damages in this action is not to be ascertained as the actual loss plaintiff sustained at the time, but for the injury done, by causing the servant, &c., to leave plaintiff's employment." Tested by this rule, the action of the Court in refusing the first of these instructions, as asked for, and giving it as modified, was correct. The former would have limited the appellee's right of recovery, for a part only of the injury sustained by him, "by the causing of his servant, &c., to leave his employment;" the latter measured the damages to be recovered by the entire injury sustained. But this was right on general principles. The *tort feazor*, in an action like this, is responsible for all the consequences growing out of his wrongful act, and the right of the party injured by him to redress, is commensurate with his liability.

The testimony preserved in the record in this case shows that the appellee and his son spent much time, and incurred great trouble and expense, in necessarily making several long journeys to a distant part of the country, to which his servant and apprentices had gone, or been taken, for the purpose of recovering possession of them. Of course, in having his ser-

vants thus enticed away from his possession, and in being himself forced to leave his home, to the neglect of his ordinary avocations, to go in pursuit of them, he was necessarily injured to an amount greater than the pecuniary expenses incurred, and the value of their service lost by him. Did not these consequences grow out of the wrongful act of the appellant, if guilty? Most assuredly they did. Then, why not allow the appellee to recover therefor? The instruction asked for admits his right to recover for the expenses incurred by him, while in pursuit of the servant, &c. enticed away; why not allow him for the value of his time, when thus employed, also? The distinction is not apparent.

In reference to the disposition made by the Court of the other instruction asked for by the appellant, we are not prepared to say that the Court erred in refusing to expound the law as he desired, and in the language suggested by him for that purpose. Indeed, it would be difficult to point out any material difference, between the instruction asked for and refused, and that given. The one placed the appellee's right of recovery upon proof "that Sukey and her children were bound to render service to" him "as his servants and apprentices"; the other "that the said negroes were his servants and apprentices". If they were his servants and apprentices, they were bound to serve him as such; otherwise, not. Then, is it not apparent, that if the instruction, as asked for, gave a correct exposition of the law, as to the proof necessary to warrant a recovery, that given did also, and in such terms, as clearly to enable the jury to understand their duty? It is probable that the Circuit Court feared, that the instruction, if given as asked for, might mislead the jury, and therefore chose to give it in different words. This it had an undoubted right to do, without thereby in the least degree derogating from the appellant's rights. A Court may not indeed refuse to give any instruction to the jury compatible with the law, and applicable to the pleadings and proof, when called for by either party; but, in giving such instruction, is not imperatively bound to adopt, as its own, the language in which it may be asked. That language may, and when in, the

estimation of the Court, it is calculated to mislead the jury, should be so modified or changed as to prevent such a result; but not so as to alter the proposed exposition of the law; that would be tantamount to a refusal to give the instruction and therefore erroneous.

The instruction asked for by the appellee, and given by the Court as the appellant alleges erroneously, was as follows, to wit: "that if the jury believe from the evidence that the plaintiff lost the entire service of the registered woman, in consequence of the defendant's acts, the plaintiff is entitled to the value of her term of service." This instruction is said to be erroneous.

*First.* Because the declaration no where claims for an entire loss of the services of the registered woman, and

*Second.* Because a portion of the term of service remained unexpired at the commencement of the suit.

The first of these objections is answered by reference to the second count, which states that the said servant was wholly lost to the appellee by means of appellant's unlawful act, &c.

To support the second objection, the case of *Hambleton* v. *Veere*, 3 Saund. 170, is mainly relied upon. That, however, I think, was not an analogous case. There the action was brought for enticing away an apprentice, in whose services alone the master had property, and the declaration claimed damages for the loss of services as well as for the time past, as for the residue of the term remaining unexpired at the commencement of the suit, and it was held that the action could not be maintained, and properly so as the master could not be said to have been deprived of the benefit of services, which, at the commencement of the suit, and even at the trial, had not become due. But here the case is very different. The master sues for enticing away his registered servant, recognized by the laws of the State as his absolute property, during the entire term of service, and alleges the entire loss of such property when he sues. If such allegation is sustained by proof, is he not entitled to recover accordingly? Then suppose that although it appears at the trial that even then the term remains unexpired. and yet that the servant was, at the commencement

of the suit, wholly lost by the master, as by having been before that time, removed to some foreign country, where legal process would be entirely unavailing to recover possession of her, would not the allegation of entire loss be sustained thereby? I think it would thus be as fully sustained as if the servant had been killed, or her term expired; for all purposes of benefit to the master, she would be considered as having passed out of existence. On such proof, the plaintiff would unquestionably be entitled to recover the full value of the term. Well, in this case the testimony shows that the servant in question was enticed away from her master, on the thirty first day of August, 1842, and had never afterwards been in his possession—that she was registered on the tenth day of January, 1817, being then five years of age, to serve until she became thirty two years old, and that consequently her term expired on the tenth day of January, 1844, after the commencement of the suit, which was on the eighth day of February, 1843, but before the trial, in April, 1844. This testimony taken in connection with the fact also in proof, that the appellee made constant but unavailing efforts to regain possession of her, after her elopement, fully sustained his claim to the value of her entire service, and warranted the instruction given by the Court. It is also sustained by the positive authority of *Dubois* v. *Allen,* referred to in Anthon's Nisi Prius, 83. It is there said "that in actions for enticing away plaintiff's servants the general rule of damages is the value of the service during the time the servant has been absent, &c. But the jury may, in certain aggravated cases, give the whole value of the servant by way of damages."

The only question remaining to be considered, is that growing out of the alleged error of the Circuit Court in refusing to allow the appellant's motion for a new trial. The grounds assigned in support of that motion were the following, to wit:

"*First.* Because said verdict is contrary to law;

*Second.* Because said verdict is contrary to evidence;

*Third.* Because improper evidence was permitted to go to the jury; and

*Fourth.* Because the Court misdirected the jury."

The last two of these grounds have already been fully dis-

Hays *v.* Borders.

cussed, and found to be untenable. For the disposition of the others, it will be sufficient, without incumbering this Opinion with the testimony found in the bill of exceptions, to say that it was proved on the trial, by the confessions of the appellant and other testimony, making out an irrefragable chain of positive and circumstantial proof, that he was knowingly and wilfully guilty of the wrongful acts charged upon him by the appellee in his declaration; and, consequently, the verdict was neither against the law nor the evidence. The Court properly refused to grant a new trial.

The judgment is affirmed with costs.

LOCKWOOD J. dissenting: I do not concur in the Opinion just delivered. I think that the registry of a servant before the clerk of the Court of Common Pleas, after the Court of Common Pleas had been abolished, was void. I am also of opinion that the registry is void, because of the uncertainty as to the age of the servant attempted to be registered.

*Judgment affirmed.*